**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FORREST THOMAS, | : | Civil Action No. 19-21859 (JMV) |
| Petitioner, | : | |
| v. | : | **OPINION** |
| BRUCE DAVIS, | : | |
| Respondent. | : | |

**VAZQUEZ, District Judge:**

Petitioner is a state prisoner currently incarcerated at New Jersey State Prison, in Trenton, New Jersey. He is proceeding *pro se* with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (D.E. 1.) For the reasons explained in this Opinion, the Court denies the Petition and will not issue a certificate of appealability.

## I.    BACKGROUND

The New Jersey Superior Court, Appellate Division, summarized the underlying circumstances of this case, on post-conviction relief ("PCR") appeal:

> On July 23, 2010, an Essex County grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2); and second-degree disturbing human remains, N.J.S.A. 2C:22-1(a)(1). The alleged victim was Carol Spratt.
>
> Defendant was tried before a jury and, at the trial, evidence was presented which showed that in 2005, Spratt and her daughter Susan Rivas moved to an apartment at New Community Gardens on Morris Avenue in Newark. Defendant, who was Rivas's boyfriend, moved into the apartment with Spratt and Rivas. Rivas died shortly thereafter, but defendant continued to reside in the apartment with Spratt.

Spratt suffered from emphysema and required an oxygen tank at all times. She also used a wheelchair and rarely left the apartment. Spratt claimed that at times defendant stole her rent money and food stamps, and also engaged in abusive behavior. In January 2010, Spratt had defendant permanently banned from the building. Despite the ban, defendant returned a few days later. He was escorted out of the building and the building's manager told him he could return that day to collect his belongings.

The State alleged that defendant returned to the apartment and killed Spratt. According to the medical examiner, the perpetrator grabbed Spratt by the wrists and compressed her neck with a significant, sustained force. That force prevented Spratt from breathing, and stopped the flow of blood from her heart to her head.

Defendant kept Spratt's dead body in the apartment for the next several days. On January 14, 2010, defendant called the aide who had provided care to Spratt, and told her that Spratt had fallen, broken her ribs, and was in the hospital. The aide went to the apartment the next day. Defendant exited the apartment, closed the door quickly behind him, and told the aide that Spratt was "okay."

Defendant disposed of Spratt's body several days later. He placed the body in two garbage bags, put the bags in a shopping cart, and covered the bags with clothes and other items. At around 3:00 a.m. on January 18, 2010, defendant exited the building pushing the shopping cart. On his way out, defendant told the security guard he had collected his possessions and would not be around anymore.

Defendant discarded the body near a dumpster behind a building on South Orange Avenue, and two scrap collectors discovered the body. The following day, the building's superintendent saw a note on Spratt's door, which stated that she should not be disturbed because she was tired and sleeping. Later that day, defendant approached Spratt's neighbor and offered to sell him items from the apartment. Defendant said Spratt had fallen, was in the hospital, and was planning to move to Florida.

On January 20, 2010, investigators from the Essex County Prosecutor's Office went to Spratt's building and spoke with the manager, who identified Spratt from an autopsy photo. The investigators were proceeding to Spratt's apartment, when they encountered defendant. He told them he was going to visit Spratt at the hospital. He agreed to be interviewed.

2

At the police station, defendant was advised of his rights and provided a statement. He claimed that he returned to the apartment on January 13 or 14, 2010, and found that Spratt had fallen. He claimed her oxygen cord was wound around her neck and she was gasping for air.

Defendant said he picked Spratt up, unwrapped the cord, and put her in bed. Spratt allegedly stated that she was all right. Several hours later, defendant found Spratt dead. He admitted that three days later, he placed Spratt's body in two garbage bags, put the body in a shopping cart, and left her near the dumpster where the body was found.

When the detectives left the interview room, defendant removed Spratt's ATM and credit cards from his wallet and attempted to hide them behind the molding in the interview room. Defendant's actions were recorded by the surveillance system.

The jury found defendant guilty of murder and disturbing human remains. The trial court thereafter sentenced defendant to life imprisonment for murder, with sixty three and three-quarter years of parole ineligibility, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

*State v. Thomas*, No. A-4706-17T1, 2019 WL 2157640, at *1–2 (N.J. Super. Ct. App. Div. May 17, 2019).  The Appellate Division affirmed the convictions, *id*. at *2, and the Supreme Court of New Jersey denied Petitioner's petition for certification. *State v. Thomas*, 127 A.3d 704 (N.J. 2015).  Petitioner then filed a PCR petition, and the PCR court denied that petition.  *Thomas*, 2019 WL 2157640, at *2.  The Appellate Division affirmed on PCR appeal, *id*. at *1, and the Supreme Court of New Jersey denied Petitioner's PCR petition for certification. *State v. Thomas*, 220 A.3d 991 (N.J. 2019).

Petitioner filed the instant Petition in December of 2019. (D.E. 1.)  Respondent filed an Answer opposing relief, (D.E. 5), and Petitioner filed a Reply, (D.E. 6).  Petitioner raises the following claims:

> 1.  Because the Appellate Division ruling in this case: (1) conflicts with the New Jersey Supreme Court's decision in *State v.*

*Calleia*, and with the Appellate Division's resolution of the issue in, *State v. Scharf*, in respect to the admissibility of hearsay evidence pertaining to the "state of mind" of a homicide victim under N.J.R.E. 803(C)(3) -- improperly allowing admission of hearsay accounts of prior bad acts of the defendant, rather than confining that evidence to actual "state of mind" testimony -- and (2) also improperly expanded harmless-error analysis of such errors to affirm a conviction when improper "admission of those hearsay statements was very likely harmless," rather than "harmless beyond a reasonable doubt," violated Petitioner's Sixth Amendment right to confrontation and Fourteenth Amendment right to due process. (D.E. 1, at 7.)

2. When the jurors reported a "deadlock" on the murder count, the Judge was obligated to give the *State v. Czachor* deadlock instruction to them, and the Appellate Division's resolution of the case -- in which it presume[d] that the trial judge likely did not regard this to be a "true deadlock" -- is in clear conflict with the relevant case law and violated Petitioner's Sixth and Fourteenth Amendment rights to a jury trial and due process.. (*Id*. at 8.)

3. Petitioner was denied a complete defense as a result of ineffective assistance of trial counsel, who failed to investigate the case adequately in violation of the Sixth Amendment to the U.S. Constitution. (*Id*. at 9.)

4. Petitioner [was] denied due process and effective assistance of counsel when he was coerced into forgoing his right to testify due to trial counsel's [failure to] adequately counsel him on his right to testify in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution. (*Id*. at 11.)

5. Petitioner [was] denied the effective assistance of counsel when counsel improperly waived Petitioner's right of confrontation, permitting the State to produce results from the autopsy without producing the witness who performed the autopsy in violation of the Sixth Amendment to the U.S. Constitution. (*Id*. at 12–13.)

6. Petitioner [was] denied the effective assistance of counsel when counsel consented to an erroneous jury instruction and [by] failing to object to the manner in which the trial court responded to jury questions in violation of the Sixth Amendment to the U.S. Constitution. (*Id*. at 14.)

7. The cumulative errors committed by Petitioner's counsel(s) resulted in a fundamentally unfair process. (*Id*. at 16.)

4

## II.      STANDARD OF REVIEW

Section 2254(a) permits a court to entertain claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioners have the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  Under § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts in habeas cases must give considerable deference to the determinations of state trial and appellate courts.  *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Moreover, AEDPA deference applies even when there has been a summary denial.  *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (citation omitted).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [Supreme Court's] decisions," as of the time of the relevant state-court decision.  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000))).  "Under the contrary to clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13 (internal quotation marks

omitted).  As to § 2254(d)(1), a federal court must confine its examination to evidence in the record.  *Cullen*, 563 U.S. at 180–81.

Where a petitioner seeks habeas relief pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA apply.  First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).  Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the court of the State." 28 U.S.C. § 2254(b)(1)(A).  To do so, a petitioner must "fairly present all federal claims to the highest state court before bringing them in a federal court."  *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007).  This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'"  *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule.  *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004).  This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment."  *Leyva*, 504 F.3d at 365–66; *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999).  Federal courts may not excuse a procedural default and grant relief unless (1) the petitioner establishes "cause"

to excuse the default and actual "prejudice" as a result of the alleged violation of federal law; or (2) the prisoner demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." *Leyva*, 504 F.3d at 366; *see also Coleman v. Thompson*, 501 U.S. 750 (1991).

A court may, however, elect to *deny* a procedurally defaulted and/or unexhausted claim on the merits under 28 U.S.C. § 2254(b)(2). *Osorio v. Anderson*, No. 17-1536, 2020 WL 206000, at *4 (D.N.J. Jan. 14, 2020) (citing *Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005)).  In that scenario, if a claim did not receive an adjudication from the state courts on the merits, a federal habeas court must review the claim *de novo*. *See Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009).

## III.   ANALYSIS

### A.  Evidence Related Claim

First, under Ground One, Petitioner contends that the trial judge erred by admitting hearsay evidence pertaining to the state of mind of the homicide victim under New Jersey Rule of Evidence 803(C)(3).  Petitioner maintains that the trial judge improperly allowed admission of "prior bad acts of the defendant," rather than confining that evidence to "actual" state of mind testimony. (D.E. 1, at 7.)  The evidence at issue stems from three witnesses, who generally testified that the victim, Spratt, complained to them about how Petitioner stole from her, took advantage of her, abused her, and how she attempted to ban him from her apartment.  The State's theory was that Petitioner knew or likely knew that Ms. Spratt suspected him of theft and was trying to extract herself from their relationship, which motivated him to take vengeance on her. *Thomas*, 2015 WL 9694263, at *5–7.

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal.  The Appellate Division denied the claim as follows:

> We first address defendant's challenge to the admission of so-called hearsay statements made by three witnesses, Celeste Bryant, Andrea Rodrigues, and Cedrecian Simmons who provided the testimony that defendant now challenges. The witnesses generally testified that Spratt complained to them that defendant stole from her, argued with her, abused her, and that Spratt sought to have defendant banned from the building three times.
>
> Defendant, in his brief, objects to the following specific testimony on appeal: Bryant claimed that Spratt had complained to her of thefts by defendant as early as December 2005 and February 2006. In November 2006, Bryant claimed, Spratt asked to have defendant evicted based on his "abusive" behavior toward her. Then there were two more requests to ban him, one of which was in early 2010 when Spratt alleged further thefts by defendant. Rodrigues testified that Spratt complained to her often about defendant stealing her money, and that those complaints were the reason why Spratt pinned her Family First and ATM cards into her pocket. Spratt said that she was fearful that defendant would steal from her if she did not pin those cards into her pocket. Rodrigues also claimed that defendant had been banned by Spratt in January 2010 because Spratt alleged he had stolen from her. Simmons testified that Spratt complained about defendant's conduct "several times" to her. She further testified that Spratt said defendant "had stolen her property and did various things around the building which could affect my residency."
>
> On appeal, defendant argues that only Spratt's latest attempt to ban defendant from the building provides a motive for murder and that the previous attempts to ban defendant merely constitute past history, noting that Spratt revoked her intent in those instances by failing to carry through with the paperwork to ban defendant. Defendant also argues that the accounts of the crimes Spratt alleged defendant committed were not evidence of defendant's motive, but instead were inadmissible hearsay.
>
> "In general, a trial court is afforded considerable latitude regarding the admission of evidence...." *State v. Nelson,* 173 *N.J.* 417, 470 (2002) (internal quotation marks omitted). "[T]he admission or exclusion of evidence is within the discretion of the trial court." *State v. Torres,* 183 *N.J.* 554, 567 (2005). "A trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion." *State v. Rose,* 206 *N.J.* 141, 157 (2011). Under

the abuse of discretion standard, the Appellate Division "sustains the trial court's ruling unless it can be shown that the trial court's ... finding was so wide [of] the mark that a manifest denial of justice resulted." *See State v. Lykes,* 192 *N.J.* 519, 534 (2007) (alteration in original) (internal quotation marks omitted).

"Our Evidence Rules generally promote admissibility of all relevant evidence...." *State v. Harris,* 209 *N.J.* 431, 439 (2012). Under *N.J. R.E.* 402, "all relevant evidence is admissible" unless "otherwise provided in [the Rules of Evidence] or by law." " 'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401.

The State claims the challenged testimony was relevant to the motive to commit murder. Proof of motive can "aid the jury, particularly in a case resting upon circumstantial evidence, in determining who the person was who committed the crime." *State v. Carter,* 91 *N.J.* 86, 102 (1982). Our Supreme Court has noted that evidence of motive has a "special role" and the "unique capacity to provide a jury with an overarching narrative, permitting inferences for why a defendant might have engaged in the alleged criminal conduct." *State v. Calleia,* 206 *N.J.* 274, 293 (2011). "Often, motive must be pieced together; potential motivating factors must be gleaned from evidence that does not itself bespeak criminal intent but merely explains what events might have led the accused to commit a criminal act." *Ibid.*

Because of that, "motive is treated somewhat differently than other types of evidence," and "a 'wider range of evidence' is permitted to prove motive, so long as it remains a material issue in a case." *Id.* at 293–94 (citations omitted). " 'Any evidence which has a legitimate bearing on the question of motive is as a general rule admissible' so long as it 'at least to a slight degree tend[s] to establish the existence of the motive relied on.' " *Id.* at 293 (quoting 41 C.J.S. *Homicide* § 325 (2006)). When evidence provides proof of motive, a "strong showing of prejudice" is necessary to exclude such evidence under the balancing test of *N.J.R.E.* 403. *Id.* at 294.

Defendant challenges the statements as hearsay. "Assuming [a] proffered statement is both relevant and not otherwise excluded, a determination must be made whether that statement is hearsay. If the statement is hearsay, it must be determined whether an exception to the hearsay rule exists to permit the statement's admission." *State v. Coder,* 198 *N.J.* 451, 463 n.5 (2009). Under *N.J.R.E.* 801(c), " '[h]earsay' is a statement, other than one made by the declarant

while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The Court in *Calleia, supra,* rejected "a *per se* rule that hearsay statements by a deceased victim may never be admitted under the state-of-mind exception to prove motive." 206 *N.J.* at 295. Instead, the Court held that "when a victim's state-of-mind hearsay statements are relevant to show the declarant's own conduct, and when such conduct is known or probably known to the defendant, it also can give rise to motive, and the statements become admissible [under the state-of-mind exception of *N.J.R.E.* 803(c)(3) ] for that purpose, subject to the usual balancing under *N.J.R.E.* 403." *Id.* at 296. The Court made clear, however, that "a prosecutor must demonstrate that a defendant knew or likely knew of a victim's conduct in order for the victim's conduct to provide motive evidence." *Id.* at 297.

Applying those principles to the evidence at trial, in accordance with our established standard of review, we find no error in the court's admission of Spratt's statements because they are clearly not hearsay. The statements are offered to prove that Spratt alleged defendant stole from her, that she wanted to ban defendant from the building, and defendant knew of the statements made by the victim. Such testimony therefore is not offered for its truth but rather, its significance is the fact that it was made and defendant knew of it.

*Thomas*, 2015 WL 9694263, at *5–7 (alterations in original). The Appellate Division then discussed the testimony at issue, the circumstances surrounding the testimony, and the trial judge's instructions to the jury on the issue. *Id*. at *7–10. Afterwards, the court concluded:

We find no error in the judge's admission of the testimony regarding the events that proved defendant's motive for murder. The testimony supported the inference that defendant's state of mind was that the relationship was permanently at an end and he was being banned from Spratt's apartment and support.

Because this evidence further showed that defendant was aware that Spratt blamed him for abuse and theft when she arranged for him to be banned from the apartment, it tends to establish that he was aware that she intended a permanent break, which in turn gives rise to motive. Accordingly, both the direct and hearsay portions of this testimony were admissible on the issue of defendant's motive in accordance with *Calleia, supra,* 206 *N.J.* at 296.

The State's theory was that defendant and Spratt were in an abusive relationship marked by defendant's need to dominate and control her. In order to admit Spratt's statements under Rule 803 as state-of-mind hearsay evidence, the State had to demonstrate that defendant "knew or likely knew" that Spratt suspected him of theft and abuse and was taking steps to further distance herself from him. *See Calleia, supra,* 206 *N.J.* at 297.

The judge concluded that the statements were relevant to Spratt's state of mind and defendant's intent and motive, reasoning that as Spratt tried more forcefully to extract herself from their relationship, defendant's need to exercise even greater control motivated him to destroy her property and eventually take her life. The Court in *Calleia* declared that "when testimony regarding a decedent's state of mind establishes a fact that, if known by defendant, could give rise to a motive, such testimony is admissible subject to balancing under Rule 403." 206 *N.J.* at 295–96. As the judge's reasoning that Spratt's belief that defendant was behind the thefts induced her to further distance herself from defendant, which she expressed to her friend and which defendant could certainly surmise by her efforts to distance herself from him, finds support in the record, we conclude he acted within his discretion in finding the evidence      admissible      under      the      state-of-mind      exception of *N.J.R.E.* 803(c)(3) to prove motive.

 Even where evidence of prior bad acts is improperly admitted, where there is "overwhelming proof" of guilt submitted by the State that is "independent of the other-crimes evidence," the error is harmless. *State v. Gillispie,* 208 *N.J.* 59 (2011); *see also State v. Soto,* 340 *N.J. Super.* 47, 65 (App.Div.) (holding that hearsay testimony that the defendant was involved in a robbery was harmless error in view of the other proofs establishing guilt), *certif. denied,* 170 *N.J.* 209 (2001).

Here, the State presented a very strong, albeit largely circumstantial, case against defendant apart from the bad acts evidence. Given the record, we conclude any error with regard to the admission of these hearsay statements was very likely harmless.

*Thomas*, 2015 WL 9694263, at *10–11. Here, the state court's decision was not an unreasonable

application of clearly established federal law. In his direct appeals, save for a passing reference to

the Sixth and Fourteenth Amendments, Petitioner relied entirely on the New Jersey Rules of

Evidence and state law cases. (*See* D.E. 5-14, at 24–34.)  The Appellate Division, in turn, addressed the issue in terms of state law. *Thomas*, 2015 WL 9694263, at *5–11.

To the extent Petitioner wishes to rechallenge this evidence based on state law cases or the New Jersey Rules of Evidence, these arguments "are not within the province of [a federal habeas court] to address." *Oliver v. Santiago*, No. 14-1334, 2017 WL 2735409, at *9 (D.N.J. June 23, 2017) (alteration in original) (quoting *Bagarozy v. Goodwin*, No. 08-0468, 2008 WL 4416455, at *14 (D.N.J. Sept. 23, 2008)).  Such errors would have been errors of state law, and federal habeas "relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).  Instead, "[t]o rise to the level of a constitutional violation, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair, thereby violating a petitioner's due process rights." *E.g.*, *Sample v. D'Ilio*, No. 15-5487, 2018 WL 3054676, at *5 (D.N.J. June 20, 2018) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994); *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001)).

In the present case, this Court perceives no error from the Appellate Division with respect to the admission of the evidence from three witnesses as to the victim's state of mind and Petitioner's motive to kill.  Petitioner argues that the "testimony . . . in its most basic form, was a series of repeated allegations by all three that the victim . . . had told them that petitioner had committed multiple crimes against her." (D.E. 1, at 7.)  Petitioner contends that the testimony was "rife with [Ms.] Spratt's hearsay accounts of criminal behavior by petitioner, which were inadmissible under any conceivable hearsay exception, and which necessarily tainted the . . . jury deliberations." (*Id*.)  In other words, Petitioner argues that the testimony was inadmissible hearsay and unduly prejudiced the jury. (*Id*.)

In rejecting Petitioner's argument, the Appellate Division thoroughly reviewed the testimony at issue, and the trial judge's careful instructions to the jury. *Thomas*, 2015 WL 9694263, at *10–11. In particular, the Appellate Division highlighted the following jury instruction:

> THE COURT: Mr. Kinsale, before you start cross-examination, ladies and gentlemen, I'm gonna give you an instruction about what this evidence is all about; and how you should treat this evidence.
>
> The State has introduced evidence that the deceased victim, prior to her demise, made statements to third parties which reflect her then state of mind. The statements were that Miss Spratt attempted to have the defendant, Thomas, evicted from her apartment and banned from the building on three separate occasions. Miss Spratt alleged that [defendant] was verbally abusive toward her and committed acts of theft of her property.
>
> Normally, such evidence is not permitted under our rules of evidence. Our rules specifically exclude evidence that is hearsay, an out-of-court statement and evidence that a defendant committed certain wrongs or acts when it is offered to show that the defendant had a disposition or tendency to do wrong and, therefore, must be guilty of the offenses. So, hearsay evidence is not admitted. All right?
>
> And the second thing is you can't offer evidence against somebody and say, "because you did these acts, he has a predisposition to commit wrong." That evidence cannot—is not admissible in a court of law. There's an exception to that; the exception is in this case.
>
> Before you give any weight to this evidence, you must be satisfied that the assertions of the victim, Carol Spratt, were uttered and you must be satisfied that the defendant committed the acts and he was aware that the victim made the allegations....
>
> Our rules do permit evidence of this nature, the state of mind of the deceased victim, which is what we're talking about here, when the evidence is used for a narrow purpose. In this case, the limited purpose to establish motive, and for no other reason. Testimony you have just heard as to what Miss Spratt said, and what she did, goes to the issue as to whether or not [defendant] had an alleged motive to commit the murder in this case. That's what it's being offered for. All right?
>
> ....

> I have admitted the evidence only to help you to decide the question
> of motive. You may not consider, for any other purpose and may not
> find the defendant guilty now simply because the State has offered
> evidence that he committed other wrongs or acts. I hope that is clear,
> but I'll repeat it again at a later time and in my final instructions.

*Id.* at *7–8 (alteration in original).  This Court must presume that the jury followed and understood the trial judge's instructions, and Petitioner offers no evidence to rebut that presumption. *E.g.*, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

In light of that instruction, the Appellate Division reasonably concluded that the testimonies were "clearly not hearsay," as they were "offered to prove that [Ms.] Spratt . . . [stated that] defendant stole from her, that she wanted to ban defendant from the building, and [that] defendant knew of the statements made by the victim." *Thomas*, 2015 WL 9694263, at *6.  The significance of the testimony was not that the prior bad acts had actually occurred, but rather, that Ms. Spratt actually said those statements, which demonstrated her state of mind.  As a result, the Appellate Division reasonably found that such testimony was "not offered for its truth but rather, its significance [was] the fact that it was made and [Petitioner] knew of" her state of mind, which then showed Petitioner's motive. *Id.* at *6–7 ("And the motive, the State submits ladies and gentlemen, is vengeance because he depended on the access to her resources. He depended on the access to her building to support himself. And when she took away his access, he took her life.").

With regard to the potential prejudice to Petitioner, the Appellate Division reasonably held that the trial judge performed a proper balancing under New Jersey Rule of Evidence 403. *Id.*  at *10.  The Appellate Division explained that the "State's theory was that defendant and [Ms.] Spratt were in an abusive relationship marked by defendant's need to dominate and control her." *Id.*  In order to use the evidence, "the State had to demonstrate that defendant 'knew or likely knew' that [Ms.] Spratt suspected him of theft and abuse and was taking steps to further distance herself from

14

him." *Id.* (quoting *State v. Calleia*, 20 A.3d 402, 416 (2011)).  The trial judge had reasoned that Ms. Spratt believed "that defendant was behind the thefts [which] induced her to further distance herself from defendant, which she expressed to her friend[s] and which defendant could certainly surmise by her efforts to distance herself from him." *Id.*  The Appellate Division reasonably held that that theory found support in the record.  Because the evidence was strongly "relevant to [Ms.] Spratt's state of mind and defendant's intent and motive," the Appellate Division reasonably concluded that the testimony was admissible under the state-of-mind exception, despite its prejudicial effect. *Id.* at *10.

Under these circumstances, this Court finds that Petitioner has failed to demonstrate an evidentiary error, let alone one that was so "arbitrary or prejudicial that it rendered the trial fundamentally unfair."  *Sample*, 2018 WL 3054676, at *5.  The Court further finds that the Appellate Division's alternate finding—that any such error was harmless—is also fully supported by the record.  As a result, Petitioner has failed to show that the state court's decision was based on an unreasonable application of clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on Ground One.

### B.  Jury Coercion Claim

Next, under Ground Two, Petitioner argues that after the jury reported a deadlock on Count One on the second day of deliberations, the trial judge should have issued a deadlock instruction pursuant to *State v. Czachor*, 413 A.2d 593, 598 (N.J. 1980).  Petitioner alleges that the "judge, without objection from either attorney, . . . simply told the jury that it had been a 'woefully short period of time' and to keep deliberating." (D.E. 1, at 8.)  The Court construes this argument as alleging that the trial judge engaged in jury coercion.

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on direct appeal. The Appellate Division denied the claim as follows:

> Defendant argues that the trial court erred when it failed to give a *Czachor* charge after the jury reported that it was deadlocked on count one. Defendant never objected to the charge given by the trial court, so he must establish plain error to succeed on appeal. *R.* 2:10–2. The State argues the court gave a proper charge, and, if the charge was improper, defendant cannot establish plain error.
>
> In the jury charge, Judge Ryan included the following paragraph regarding deliberations:
>
>> Your verdict must represent the considered judgment of each juror and must be unanimous as to each charge. This means that all of you must agree if the defendant is guilty or not guilty of that charge. It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous; but do not surrender your honest convictions as to the weight of the evidence or effect of the evidence solely based upon the opinion of your fellow jurors, or for the mere purpose of reaching a verdict.
>
> The charge closely tracks the Model Jury Charge. See Model Jury Charge (Criminal), "Criminal Final Charge—Part 4 (Deliberations to Jury Questions)" (2013).
>
> The jury began deliberating at 11:43 a.m. on December 16, 2011. At 11:57 a.m., the jury sent a note to the judge asking one question. The jury entered the courtroom to hear the answer to the question at 12:12 p.m. The jury left the courtroom to continue deliberating at 12:13 p.m. The jury re-entered the courtroom at 12:21 p.m., at which time the jury was dismissed for lunch. After lunch, the jury began deliberating at 1:30 p.m. Five minutes later, the jury sent the court another note, this time asking four questions. The jury entered the courtroom to hear the answer at 1:53 p.m., and left at 1:57 p.m.

At 2:20 p.m., the jury sent another note stating, "Number 1: We are deadlocked on one." and "Number 2: We've reached a verdict on the second." After conferring with counsel about what to tell the jury, the court decided to tell the jury it had been a very short period of time and deliberations should continue. Neither the prosecutor nor defense counsel objected. The court instructed the jury:

> Ladies and gentlemen of the jury, you've been deliberating on a case like this for two hours. It's a woefully short period of time. I'm gonna urge you to continue your deliberations with the objective of reaching a determination on both counts. Take your time and do what you have to do, but it's too short a time. And please, consult with each other and continue your deliberations.
>
> I'm gonna sit today until four o'clock and then if I have to come back next week, we come back next week. All right? I don't mean that in any way to have you rush; I'm just telling you, I think I have an obligation to tell you what the timeframe is here. Okay? So, I thank you for all you've done so far and I urge you to continue your deliberations.
>
> Please retire.

The jury began to deliberate again at 2:36 p.m., and returned a verdict at 3:15 p.m.

A conviction will be reversed when the jury instructions convey pressure on the jurors to return a verdict because such pressure is "inconsistent with jury freedom and responsibility" and "does not permit jurors to deliberate objectively, freely, and with an untrammeled mind." *Czachor, supra,* 82 *N.J.* at 402. The Court approved an instruction to use when a jury says it is deadlocked, reminding dissenting jurors to hold onto their honest convictions regarding "the weights or effect of evidence...." *Id.* at 405 n.4. The supplemental charge in this case did not present the *Czachor* charge.

While the Court has recognized that "[a] supplemental charge that directs a jury to continue deliberating but does not remind them of their obligation [to hold onto honest convictions] poses a grave risk of being misunderstood by the jurors and therefore, of being coercive," the trial court does have some discretion when deciding whether to give a supplemental charge. *State v. Figueroa,* 190 *N.J.*

17

219, 240 (2007). As the Court stated in *Figueroa, supra,* 190 *N.J.* at 235:

> We ... left it to the sound discretion of the trial court to decide whether repeating the charge is appropriate when a jury reports that it is unable to agree.

The Court continued, saying,

> We cautioned trial courts faced with deciding whether to give or repeat the charge to consider "such factors as the length and complexity of [the] trial and the quality and duration of the jury's deliberations."

*Ibid.* (quoting *Czachor, supra,* 82 *N.J.* at 407).

In this case, it is clear that Judge Ryan viewed the note from the jury about being "deadlocked" as not being a true deadlock. The court and counsel reasonably determined the jury could not be truly deadlocked after deliberating for two non-consecutive hours after hearing days of testimony in a murder trial. The court was well within its discretion to take the action it did in this case.

There also is nothing coercive about the trial court's supplemental instructions to the jury in this case. The charge did not violate the core holding of *Czachor;* it was not a charge focused solely on the minority meant to "undo a jury deadlock," but was more along the lines of a reminder to the jury to cooperate and continue deliberating. *See State v.* Adim, 410 N.J. Super. 410, 425 (App. Div. 2009) (quoting *Czachor, supra,* 82 *N.J.* at 398). This case does not present a situation like *Czachor, supra,* 82 *N.J.* at 394–95, 398, where the jury said three times that it was deadlocked over the course of two days and the charge focused solely on the dissenters, or *Figueroa, supra,* 190 *N.J.* at 226, where the jury deliberated for an entire day and the supplemental instruction indicated the jury would have to deliberate over the weekend if it could not reach a verdict.

*Thomas*, 2015 WL 9694263, at *13–15 (alterations in original).  Here, the state court's decision was not an unreasonable application of clearly established federal law and its decision was based on a reasonable determination of the facts.

To the extent Petitioner wishes to rechallenge the trial judge's instructions based on *State v. Czachor*, 413 A.2d at 598 (N.J. 1980), or other state law cases, such errors would be errors of state law, and federal habeas "relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67; *Rosemeyer*, 117 F.3d at 110.   To the extent Petitioner wishes to challenge the instructions based on federal law, "[t]he clearly established [federal] law relevant to . . . [jury coercion] is sparse." *Wong v. Smith*, 562 U.S. 1021 (2010) (Alito, J., Dissenting); *Smith v. Nogan*, No. 18-11952, 2022 WL 1320582, at *9 (D.N.J. May 3, 2022); *Camel v. Att'y Gen. of New Jersey*, No. 17-5298, 2020 WL 6042479, at *13 (D.N.J. Oct. 13, 2020).   The only Supreme Court case that has addressed "the constitutional rule against coercive jury instructions" is *Lowenfield v. Phelps*, 484 U.S. 231 (1988). *Wong*, 562 U.S. at 1021.   In *Lowenfield*, the Court held that coercive jury instructions are unconstitutional, and that courts must judge coerciveness based on the totality of the circumstances. *Lowenfield*, 484 U.S. at 237–41.

With those principles in mind, it appears that the Appellate Division considered all of the relevant circumstances before concluding that the trial judge had not coerced the jury. *Thomas*, 2015 WL 9694263, at *13–15.   The Appellate Division agreed with the trial judge that "the jury could not be truly deadlocked after deliberating for *two non-consecutive hours* after hearing days of testimony in a murder trial." *Id*. at *14 (emphasis added).   The court also considered that "[n]either the prosecutor nor defense counsel objected" after conferring with the trial judge, or after the judge "decided to tell the jury [that] it had been a very short period of time and [that] deliberations should continue." *Id*.   Further, the Appellate Division emphasized that the jury charge did not focus on dissenters, *i.e.*, "it was not a charge focused solely on the minority meant to 'undo a jury deadlock,' but was more along the lines of a reminder to the jury to cooperate and continue deliberating." *Id*. at *15.   Consequently, this Court finds that the Appellate Division reasonably

concluded that there was "nothing coercive about the trial court's supplemental instructions to the jury." *Id*.

For those reasons, Petitioner has failed to show that the state court's decision was based on an unreasonable application of clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on Ground Two.

### C. Ineffective Assistance of Counsel Claims

Petitioner next raises multiple claims of ineffective assistance of counsel.[1] The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Cont. amend. VI. The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). To prevail on a claim of ineffective assistance of counsel, a petitioner must establish that

---

[1] In his PCR proceedings, the parties had disputed whether Petitioner was procedurally barred from pursuing these claims. *Thomas*, 2019 WL 2157640, at *3. It appears that due to the phrasing of the headings, the PCR court alternatively denied the claims on procedural grounds, on the theory that they could have been raised on direct appeal. (D.E. 5-21, at 2–3.) The substance of Petitioner's counseled PCR brief, however, addressed the claims as claims of ineffective assistance of counsel. (*Id*. at 27–53.)

On PCR appeal, the Appellate Division did not decide the procedural bar issue and denied the claims on the merits. *Thomas*, 2019 WL 2157640, at *3 ("Defendant contends these claims of ineffective assistance of counsel could not have been raised on direct appeal. However, we need not address defendant's argument because the record is sufficient to address the merits of these claims in this appeal."). Afterwards, Petitioner raised these claims in his PCR petition for certification, and the Supreme Court of New Jersey denied certification. (D.E. 5-30; D.E. 5-32.)

As Respondent has not raised procedural default as an affirmative defense, (D.E. 5), and because it appears that Petitioner has otherwise properly exhausted these claims, this Court will not decide whether these claims are procedurally defaulted. *Szuchon v. Lehman*, 273 F.3d 299, 321 (3d Cir. 2001) (explaining that procedural default is an affirmative defense and that the "state ordinarily is required to assert a procedural default in its answer if it intends to rely on that defense").

(1) counsel's performance was deficient, and (2) that the deficient performance prejudiced the petitioner. *See id.* at 687.

The first *Strickland* prong is an objective standard which requires the petitioner to show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. at 687.  In evaluating whether counsel was deficient, "the proper standard for attorney performance is that of reasonably effective assistance." *Id*.  The Constitution requires a fair trial, not some higher quality of legal representation. *See id.* at 688–89.  Thus, the standard is highly deferential, and courts presume that counsel has "rendered adequate assistance" and to have used "reasonable professional judgment." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016).  The second prong of the *Strickland* test requires that a petitioner demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  The petitioner bears the burden of demonstrating how he was prejudiced.  Thus, where a petition contains "no factual matter . . . and only provides unadorned legal conclusion[s] . . . without supporting factual allegations, that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief." *Judge v. United States*, 119 F. Supp. 3d 270, 280–81 (D.N.J. 2015) (internal quotation marks omitted) (citations omitted).

A court need not address both components of the ineffective assistance inquiry. *Strickland*, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" courts should follow that course. *Id.*  Finally, even if a petitioner can establish both prongs of *Strickland*, a habeas petition fails unless the petitioner can demonstrate that the

state court applied *Strickland* in an "objectively unreasonable manner." *See Woodford v. Viscotti*, 537 U.S. 19, 24–25 (2002); *see also* 28 U.S.C. § 2254(d)(1).

### 1.  Ineffective Assistance of Counsel in Failing to Obtain the Victim's Medical Records

Under Ground Three, Petitioner contends that counsel was ineffective for failing to obtain Ms. Spratt's medical records.  Petitioner appears to argue that the medical records would have supported his claim that Ms. Spratt died due to her poor health and a possible accident. (D.E. 1, at 10.)

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on PCR appeal. The Appellate Division denied the claim as follows:

> Defendant argues that his trial attorney was deficient because he did not obtain Spratt's medical records. Defendant contends the medical records would have supported an argument that Spratt's death was the result of her extremely poor medical condition, advanced age, and a possible accident.

> Defendant argues that the medical records were vital to his argument that the State failed to prove causation. He argues that the PCR court erred by finding that his attorney engaged in a reasonable strategy when he elected not to obtain the medical records.

> We need not consider whether counsel reasonably elected, as a matter of trial strategy, not to obtain Spratt's medical records. Assuming that counsel erred by failing to obtain these records, defendant did not establish that he was prejudiced by counsel's error.

> Spratt's medical records showed that she was suffering from chronic obstructive pulmonary disease, and required an oxygen tank to assist her breathing. At trial, Mitchell testified that the autopsy showed Spratt's neck had been compressed with a significant, sustained force, which stopped the flow of blood between her heart and head and caused her death. Defendant has not shown that if Spratt's medical records had been introduced into evidence, they would have led the jury to conclude that Spratt died as the result of some other cause.

> On appeal, defendant argues that the jury should have been permitted to consider whether Spratt's medical conditions were an "alternative theory of causation." However, in support of his PCR petition, defendant did not present an affidavit or certification of a qualified medical professional, with an opinion that Spratt died due to her medical conditions, rather than a neck compression resulting from the application of a significant, sustained force.

*Thomas*, 2019 WL 2157640, at *4.

With that decision in mind, Petitioner has not shown that the state court unreasonably applied *Strickland*. The Appellate Division assumed *arguendo* that counsel erred by failing to obtain the records but based its holding on Petitioner's failure to demonstrate prejudice under *Strickland*. *Id.* The Appellate Division explained that the autopsy showed that Ms. Spratt's "neck had been compressed with a significant, sustained force, which stopped the flow of blood between her heart and head and caused her death." *Id.* The court found that Petitioner failed to explain how the medical records "would have led the jury to conclude that Spratt died as the result of some other cause." *Id.* Nor did Petitioner submit an expert report to support his allegation that Ms. Spratt "died due to her medical conditions, rather than a neck compression resulting from the application of a significant, sustained force." *Id.*

In his Petition, Petitioner again fails to explain exactly how the medical records would have led the jury to a different result.[2] (D.E. 1.) Petitioner speculates that the records could have raised "a reasonable doubt about whether the defendant's actions caused the . . . death or whether she was [a] victim of her own poor health," but fails to explain how or why the jury would reach a different conclusion. (D.E. 1, at 10; D.E. 6, at 13–15.) Petitioner argues that the records would have elaborated on the victim's "fragile medical condition," (D.E. 1, at 10; D.E. 6, at 13–15), but that would not contradict the autopsy's cause of death, "a neck compression resulting from the

---

[2] Petitioner did not provide a copy of those records.

application of a significant, sustained force." *Thomas*, 2019 WL 2157640, at *4.  As a result, on this record, this Court finds that the Appellate Division reasonably concluded that Petitioner failed to establish *Strickland* prejudice.  Taken together, Petitioner has failed to show that the Appellate Division unreasonably applied either prong of *Strickland*, and he is not entitled to habeas relief on Ground Three.

### 2.  Ineffective Assistance of Counsel in Failing to Adequately Advise Petitioner on his Right to Testify

Next, under Ground Four, Petitioner contends that counsel was ineffective for failing to adequately advise Petitioner on his right to testify. (D.E. 1, at 11.)  Petitioner argues that this failure "coerced [him] into forgoing his right to testify." (*Id*.)  Petitioner wished to testify about his long history with Ms. Spratt, and that she died as a "result of a terrible accident; he insists that he would never have intentionally caused her death."  (*Id*.)  Further, he wished to testify that "he tripped on . . . [Ms. Spratt's] oxygen tube, accidentally knocking her down, and then fell on top of her . . . cleaned her up and changed her tubing," but "two hours later, when Petitioner checked on her, she was deceased. [So] Petitioner panicked and hid her body." (*Id*.)  Despite relaying this version of the events to counsel, Petitioner alleges that counsel did not consult with him as to the benefits and dangers of testifying at trial, simply insisting that Petitioner not testify. (*Id*.)

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on PCR appeal.  The Appellate Division denied the claim as follows:

> Defendant argues that his trial attorney coerced him to decide against testifying at trial. The record does not support defendant's argument. At trial, the judge questioned defendant on the record concerning his decision not to testify:

>> THE COURT: Mr. Thomas, [your attorney] indicated to me you're electing not to testify in this case. Correct?

THE DEFENDANT: Yes.

THE COURT: Have you had ample opportunity to confer with [your attorney] regarding that?

THE DEFENDANT: Yes.

THE COURT: And based upon your conversations with him and your full and complete consultation with him, you've come to the decision not to testify. Is that correct.

THE DEFENDANT: Yes, it is.

....

THE COURT: Nobody's forced or coerced or threatened you to do this; you're doing this of you own free will?

THE DEFENDANT: Yes.

THE COURT: You've been represented by [your attorney] throughout these proceedings. Are you satisfied with his representation in all respects?

THE DEFENDANT: Yes.

As the record shows, defendant never asserted his attorney had coerced him to decide against testifying. Defendant also told the judge that he was satisfied with his attorney's representation "in all respects[.]" Thus, the record provides no support to defendant's claim that his attorney coerced him to decide not to testify.

*Thomas*, 2019 WL 2157640, at *5 (alterations in original).

Petitioner has not shown that the state court unreasonably applied either of the *Strickland* prongs.  The Appellate Division observed that the record contradicted Petitioner's allegations that counsel never consulted with him on his right to testify, or coerced him into forgoing that right. *Id*.

Petitioner fails to offer any evidence to support this claim, except his own bald assertions. Nor does Petitioner address his prior statements—which he made under oath—despite the fact that Respondent raised the issue in his Answer. (D.E. 5, at 19; D.E. 6, at 16–17.)  Petitioner does not, for example, allege that he committed perjury in response to the trial court's questions regarding his right to testify.  As Petitioner has not presented clear and convincing evidence to rebut the Appellate Division's factual finding, 28 U.S.C. § 2254(e)(1), he cannot demonstrate that his counsel was deficient under the first prong of *Strickland*. *See, e.g.*, *Calhoun v. Bonds*, No. 16-4100, 2019 WL 1253834, at *11 (D.N.J. Mar. 19, 2019).  Petitioner has failed to show that the state court's decision was based on an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Accordingly, he is not entitled to habeas relief on Ground Four.

### 3.  Ineffective Assistance of Counsel for Failing to Object to Testimony Regarding the Autopsy

Under Ground Five, Petitioner argues that counsel was ineffective for failing to object to Dr. Mitchell's testimony about the autopsy report, on the ground that Dr. Mitchell did not perform the autopsy. (D.E. 1, at 12–13.)  Although Petitioner expresses his disagreement with the state courts' decisions on this issue, he does not explain why he believes that counsel's strategy was deficient or how that strategy prejudiced him. (*Id.*; D.E. 6, at 18–19.)  Rather, Petitioner appears to believe that it would have been preferable to cross-examine the doctor who authored the report but fails to explain how that would have persuaded the jury to arrive at a different conclusion. (D.E. 1, at 12–13; D.E. 6, at 17–19.)

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on PCR appeal. The Appellate Division denied the claim as follows:

Defendant further argues that his trial attorney erred by failing to object to Mitchell's testimony about the autopsy report on the ground that Mitchell did not perform the autopsy. In defendant's direct appeal, we held that defendant had waived his Confrontation Clause objection to Dr. Mitchell's testimony because he did not raise the objection at trial. *Thomas*, slip op. at 30.

In our opinion, we noted that on cross-examination, defense counsel had "attempted to obtain helpful testimony" from Mitchell that Spratt may have choked on her oxygen tube. *Ibid.* We also pointed out that defense counsel attempted to show that because Mitchell did not perform the autopsy, his testimony might not be reliable. *Ibid.* Defendant's attorney made the same point in his summation. *Ibid.*

We stated that, "Defendant made a clear choice to pursue a trial strategy of attempting to cast doubt on Mitchell's conclusions by focusing the jury's attention on the fact he did not perform the autopsy in this case." *Id.* at 30-31. We held that under the circumstances, defendant could not claim that Mitchell's testimony deprived him of his right to confrontation, and counsel's failure to object was not an error "clearly capable of producing an unjust result." *Ibid.* (quoting *State v. Williams*, 219 N.J. 89, 99 (2014)).

For essentially the same reasons, we reject defendant's claim that he was denied the effective assistance of counsel because his attorney failed to object to Mitchell's testimony on Confrontation Clause grounds. Defense counsel pursued a reasonable trial strategy of attempting to discredit Mitchell's testimony because he did not perform the autopsy. Moreover, it is reasonable to assume that if counsel had objected to Mitchell's testimony, the State would have presented testimony from the doctor who performed the autopsy.

*Thomas*, 2019 WL 2157640, at *5–6.

The state court's decision was not an unreasonable application of clearly established federal law. The Court construes Petitioner as claiming that counsel's deficient performance violated his rights under the Confrontation Clause of the Sixth Amendment, which is applicable to the States through the Fourteenth Amendment. *Tennessee v. Lane*, 541 U.S. 509, 523 (2004). The Confrontation Clause guarantees a criminal defendant the right to confront "the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause bars the "admission of testimonial

27

statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). The Confrontation Clause often arises "when a witness refers to specific information from a non-testifying third party." *Turner v. Warden*, No. 18-17384, 2022 WL 951309, at *8 (D.N.J. Mar. 30, 2022). The right to confrontation, however, may "be waived, including by [a] failure to object to the offending evidence." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 314 n.3 (2009).

Petitioners can waive this right if the waiver is a voluntary, knowing, and intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). Alternatively, attorneys can waive this right on a client's behalf. *United States v. Williams*, 403 F. App'x 707, 708 (3d Cir. 2010) ("We agree with our sister circuits and conclude that the Confrontation Clause does not require that the defendant personally waive his confrontation rights."). "The validity of counsel's waiver depends on whether the defendant dissented from his counsel's decision and whether counsel's decision was a legitimate trial tactic or part of a prudent trial strategy." *Id*.

As a preliminary matter, the Court must decide whether the Confrontation Clause applies to autopsy reports on habeas review. The "Supreme Court has not opined on whether an autopsy report qualifies as 'testimonial evidence' under the Confrontation Clause." *Green v. Kauffman*, No. 19-2919, 2020 WL 5039394, at *11 (E.D. Pa. Aug. 26, 2020); *Portes v. Capra*, 420 F. Supp. 3d 49, 55 (E.D.N.Y. 2018) ("The Supreme Court has not addressed . . . the question of whether autopsy reports are . . . testimonial statements."). Indeed, at least two Circuit Courts of Appeal have upheld the denial of Confrontation Clause claims on that basis. *See Mitchell v. Kelly*, 520 F. App'x. 329, 331 (6th Cir. 2013) (upholding denial of a confrontation clause claim because "[n]o

Supreme Court precedent clearly established that an autopsy report constitutes testimonial evidence"); *Nardi v. Pepe*, 662 F.3d 107, 111–12 (1st Cir. 2011) (upholding a denial because "an autopsy report can be distinguished from, or assimilated to, the sworn documents in" other Supreme Court cases, and finding that the "law has continued to evolve and no one can be certain just what the Supreme Court would say about that issue today").  As there is no "clearly established Federal law, as determined by the Supreme Court of the United States," as to whether the Confrontation Clause applies to autopsy reports, Petitioner cannot rely on the Confrontation Clause as a basis for habeas relief.  28 U.S.C. § 2254(d)(1).  Accordingly, for that reason, Petitioner is not entitled to habeas relief on Ground Five.

Alternatively, assuming *arguendo* that the Confrontation Clause applies to autopsy reports, the Court finds that counsel reasonably waived Petitioner's right to confrontation.  Once again, the "validity of counsel's waiver depends on whether the defendant dissented from . . . counsel's decision and whether counsel's decision was a legitimate trial tactic or part of a prudent trial strategy." *Williams*, 403 F. App'x at 708.  Petitioner fails to allege that he dissented from his attorney's decision regarding the autopsy report, at any point during the trial. (D.E. 1, at 12–13; D.E. 6, at 17–19.)  Moreover, the Appellate Division reasonable concluded that defense counsel's decision was part of a reasonable trial strategy. *Thomas*, 2019 WL 2157640, at *5–6.  As the Appellate Division explained, "defense counsel had attempted to obtain helpful testimony from [Dr.] Mitchell that Spratt may have choked on her oxygen tube . . . [and] attempted to show that because [Dr.] Mitchell did not perform the autopsy, his testimony might not be reliable." *Id*. at *5.  The Court agrees that defense counsel "pursued a reasonable trial strategy of attempting to discredit [Dr.] Mitchell's testimony because he did not perform the autopsy." *Id*. at *6.  Taken

together, defense counsel validly waived Petitioner's Confrontation Clause rights, and Petitioner cannot claim a violation of those rights as a basis for habeas relief.

Returning then to the *Strickland* analysis. For substantially the same reasons above, this Court finds that the Appellate Division reasonably applied *Strickland* in concluding that counsel was not deficient, as he pursued a reasonable trial strategy of attempting to discredit Dr. Mitchell. As the Appellate Division rested its analysis under the first *Strickland* prong, it was not required to address whether Petitioner demonstrated *Strickland* prejudice. *Strickland*, 466 U.S. at 697. That said, the Court would have also denied the claim for Petitioner's failure to demonstrate *Strickland* prejudice. As mentioned above, it appears that Petitioner would have preferred to cross-examine the doctor who authored the autopsy report, rather than Dr. Mitchell, but Petitioner fails to explain how that would have persuaded the jury to arrive at a different conclusion. (D.E. 1, at 12–13; D.E. 6, at 17–19.) Accordingly, for all those reasons, Petitioner is not entitled to habeas relief under Ground Five.

### 4. Ineffective Assistance of Counsel for Failing to Object to the Trial Court's Handling of a Jury Question

Next, under Ground Six, Petitioner argues that counsel was ineffective for failing to object to the trial judge's response to a jury question during deliberations. (D.E. 1, at 14–15.) The jury's first question asked whether the shopping cart that was introduced into evidence was the same cart that someone had used to hold the body. *Thomas*, 2019 WL 2157640, at *6. The trial judge initially answered "yes," but after the jury asked a second shopping cart related question, defense counsel objected, and the judge instructed the jury on the issue. *Id*. Petitioner argues that the jury instructions were confusing and improperly shifted the burden of proof to Petitioner. (D.E. 6, at 22.)

The last reasoned state court decision as to this claim is the Appellate Division's opinion

on PCR appeal. The Appellate Division denied the claim as follows:

> Defendant asserts his trial attorney was deficient because he consented to an erroneous response to a question that the jury sent to the court during deliberations. The jury asked whether the shopping cart introduced into evidence was "the same cart used to hold the body." After consulting with counsel, the judge told the jury that the answer to the question was "Yes." Another note from the jury followed, and it included additional questions regarding the shopping cart.
>
> Defense counsel then asserted that the judge should not have responded "Yes" to the previous question. The judge agreed and instructed the jury that his previous answer was not complete. The judge stated
>
> > The answer is "yes" but ... I can't answer questions ... you pose to me because they're factual questions.
> >
> > ....
> >
> > [Y]ou have to listen to each other ... and reach a decision as to whether or not [the] evidence ... or lack of evidence ... is sufficient information for you to make a decision as to guilt or innocence, fairly and impartially.
>
> On appeal, defendant argues that the judge's instruction was confusing and erroneous because the answer to the jury's initial question should not have been "Yes," and the additional instruction was contradictory. He contends that because the instruction would have a prejudicial impact on the jury's findings of fact, his trial attorney should have raised a timely and specific objection. Defendant also contends the instruction improperly shifted the burden of proof to defendant to produce evidence of his innocence.
>
> Again, we disagree. It appears the judge may have erred by responding to the jury's first question by stating, "Yes." It seems that the assistant prosecutor and the judge also assumed that the shopping cart in evidence was the same shopping cart used to move Spratt's body. In any event, defendant has not shown that counsel's error prejudiced the defense. As noted, the judge corrected the mistake by providing a timely instruction.

> Moreover, the amended instruction did not shift the burden of proof to defendant. Defendant contends the instruction was in conflict with the earlier instruction in which the judge told the jurors that the State had the burden of proof on all elements of the charged offenses. The judge's instruction did not relieve the State of its burden of proof, which was clearly described in the court's final instructions.

*Thomas*, 2019 WL 2157640, at *6 (alteration in original).

Here, the state court's decision was not an unreasonable application of clearly established federal law. "The United States Supreme Court and the Third Circuit have made clear that it is not the role of the federal courts to review state court jury instruction rulings that are based on state law." *Howard v. D'Ilio*, No. 14-4758, 2018 WL 1014168, at *5 (D.N.J. Feb. 22, 2018) (citing *Estelle*, 502 U.S. at 67–68; *Echols v. Ricci*, 492 F. App'x. 301, 312 (3d Cir. 2012)). Instead, "habeas review of jury instructions is limited to those instances where the instructions violated a defendant's due process rights." *Echols*, 492 F. App'x. at 312.

To warrant relief, a jury instruction error must have "so infected the entire trial that the resulting conviction violate[d] due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Henderson v. Kibbe*, 431 U.S. 145, 154, (1977). It is not enough for the instruction to be "undesirable, erroneous, or even 'universally condemned.'" *Henderson*, 431 U.S. at 154 (quoting *Cupp*, 414 U.S. at 146). The Supreme Court has held that petitioners face an "especially heavy" burden, when they base their argument on an omitted instruction, because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155.

Petitioner has failed to show that the trial court's shopping cart instruction "so infected the entire trial that the resulting conviction violate[d] due process." *Cupp*, 414 U.S. at 147. As the Appellate Division reasoned, although the trial judge may have committed an error by responding "yes" to the jury's first question, "the judge corrected the mistake by providing a timely

instruction." *Thomas*, 2019 WL 2157640, at *6.  The judge advised that he cannot answer factual

questions, and that the jury must decide factual issues. *Id*.

More specifically, in response to receiving the second question regarding the shopping cart

and three other factual questions, the trial judge responded:

> When you asked me your first question . . . about the shopping cart;
> was the shopping cart . . . the same cart used to hold the body? And
> I said "yes to you." I said "yes" to you because [counsel for both
> parties] agreed that the answer was "yes" but I . . . should have added
> . . . .
>
> The answer is yes, but . . . I can't answer questions like this that . . .
> you pose to me because they're factual questions.  The only reason
> why I did it on the first not is because we agreed.  I can't answer
> your factual questions.  As I indicated to you during the course of
> my instructions to you, you have to decide this case based upon your
> independent and collective recollection of what the evidence is,
> make a decision based upon that evidence as you recall it, fairly and
> impartially, and apply the standard of proof beyond a reasonable
> doubt.

(D.E. 5-10, at 83:22 to 84:16).  After a discussion at side bar, the trial judge agreed to clarify that

this limiting instruction applied to the jury's first shopping cart question as well:

> So, as to the *five* questions you've posed to me, you have to do that.
> All right? My responsibility is to judge the case by the law.  All
> right? You guys are the judges of the facts.
>
> I'm sorry I can't be more specific or supply you with more
> information; that's not my role and that's not my function.  If I did
> that, I would be sanctioned for it, actually.

(D.E. 5-10, at 86:11–14.)  In light of these limiting instructions, the Appellate Division reasonably

held that "the judge corrected the mistake by providing a timely instruction," and that the judge

"did not relieve the State of its burden of proof, which was clearly described in the court's final

instructions."  *Thomas*, 2019 WL 2157640, at *6.  Once again, this Court must presume that the

jury followed and understood the trial judge's limiting instructions, and Petitioner offers no

evidence to rebut that presumption. *E.g.*, *Weeks*, 528 U.S. at 234.  Nor does Petitioner explain how exactly the instructions were confusing. (D.E. 1, at 14–15; D.E. 6, at 19–23.)

Returning to the *Strickland* analysis, because the trial judge corrected his mistake by providing a timely and proper instruction, the Appellate Division reasonably denied this claim for Petitioner's failure to establish *Strickland* prejudice.  As the Appellate Division based its analysis under the second *Strickland* prong, it was not required to address whether counsel was deficient under the first *Strickland* prong.  *Strickland*, 466 U.S. at 697.

For all those reasons, Petitioner has failed to show any instructional error, let alone one so prejudicial that it "infected the entire trial" and caused his convictions to violate due process. *Cupp*, 414 U.S. at 147.  In turn, Petitioner failed to demonstrate that the state court's decision on this ineffective assistance of counsel claim was based on an unreasonable application of clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on Ground Six.

### 5.  Cumulative Error

Finally, under Ground Seven, Petitioner argues that counsel's cumulative errors "resulted in a fundamentally unfair process." (D.E. 1, at 16.)  In support of this claim, Petitioner briefly reiterates his allegation under Ground Three that Ms. Spratt's medical records could have led the jury to conclude that "she had an accident or succumbed to her frail medical condition," and then summarily adds that the "plethora" of other errors violated his rights. (*Id.*)

The last reasoned state court decision with respect to this claim is the Appellate Division's opinion on PCR appeal. The Appellate Division denied the claim as follows:

> Defendant argues that even if the errors he cites did not individually constitute reversible error, in the aggregate, they denied him of his constitutional right to a fair trial or required an evidentiary hearing. Our Supreme Court has held that "even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a

verdict to require reversal." *State v. Jenewicz*, 193 N.J. 440, 473 (2008) (citing *State v. Koskovich*, 168 N.J. 448, 540 (2001)). The cumulative error principle does not apply in this case. As we have explained, there were no series of errors that, when considered in combination, cast sufficient doubt on the jury's verdict to require a new trial or an evidentiary hearing.

*Thomas*, 2019 WL 2157640, at *7.  Here, the state court's decision was not an unreasonable application of clearly established federal law.

Under the cumulative error doctrine, even if none of a petitioner's claims amounts to a constitutional violation, the "cumulative effect of the alleged errors may violate due process." *Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980); *State v. Jenewicz*, 193 N.J. 440, 473 (2008). The Supreme Court, however, "has not clearly established that habeas relief is warranted on the basis of alleged cumulative trial errors." *Kennon v. Johnson*, No. 16-0756, 2019 WL 413537, at *12 (D.N.J. Feb. 1, 2019) (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)); *see also Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 590 n.7 (3d Cir. 2015) ("There is some debate . . . as to whether cumulative error claims constitute clearly established federal law as determined by the Supreme Court for the purposes of deference under AEDPA."); *Taylor v. May*, No. 11-1251, 2022 WL 980859, at *32 (D. Del. Mar. 31, 2022) ("It appears that the United States Supreme Court has not recognized the concept of cumulative error.").  As there is no "clearly established Federal law, as determined by the Supreme Court of the United States," as to whether the cumulative error doctrine applies in habeas cases, Petitioner cannot rely on that doctrine as a basis for habeas relief.  28 U.S.C. § 2254(d)(1).  Accordingly, for that reason, Petitioner is not entitled to habeas relief on Ground Seven.

Alternatively, assuming *arguendo* that Petitioner may raise a cumulative error claim, this the claim falls short on the merits.  First, "the cumulative error analysis does not apply without

errors by counsel to aggregate." *E.g.*, *Kennon*, 2019 WL 413537, at *12. As explained above, counsel was not deficient under Grounds Four and Five. As a result, they provide no errors to aggregate. Petitioner's remaining claims, Ground Three, related to the victim's medical records, and Ground Six, related to the shopping cart jury instruction, are not necessarily errors, as they failed only on prejudice grounds. Assuming that counsel erred on Grounds Three and Six, Petitioner "is not entitled to relief based on cumulative errors unless he can establish actual prejudice." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotation marks omitted). As discussed above, Petitioner failed to demonstrate that he suffered any prejudice in connection with Grounds Three and Six. In turn, there is no prejudice to aggregate for Petitioner's cumulative error claim. As a result, this Court finds that the Appellate Division reasonably concluded that there was "no series of errors that, when considered in combination, cast sufficient doubt on the jury's verdict to require a new trial or an evidentiary hearing." *Thomas*, 2019 WL 2157640, at *7.

For all those reasons, Petitioner has failed to demonstrate that the state court's decision on cumulative error was based on an unreasonable application of clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on Ground Seven.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003).   Petitioner has not made a substantial showing of a denial of a constitutional right.
Accordingly, this Court will not issue a certificate of appealability.

## V.    CONCLUSION

For the foregoing reasons discussed, the Court will deny the Petition and will not issue a
certificate of appealability.  An appropriate Order accompanies this Opinion.


Dated: March 22, 2023

_____
JOHN MICHAEL VAZQUEZ
United States District Judge